

**SEALED**

# UNITED STATES DISTRICT COURT

**FILED**

for the

Eastern District of California

JAN 1 8 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

|  |  |
|---|---|
| United States of America | ) |
| v. | ) |
|  | ) Case No. |
| XAVIER ALEXANDER SPEROPOULOS and | ) |
| LAUREN CROWE. | ) |
|  | ) |
|  | ) |

2:19 - MJ - 0019     EFB

_____
*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ July 1, 2018 to Present _____ in the counties of _____ Placer and Sacramento _____ in the

_____ Eastern _____ District of _____ California _____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21 U.S.C. § 841(a)(1) | Distribution of a Controlled Substance |
| Title 21 U.S.C. § 846 | Conspiracy to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Trevor R. Covert
United States Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1-18-2019

_____
*Judge's signature*

City and state: Sacramento, CA

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANT

I, Trevor R. Covert, being duly sworn, hereby depose and state as follows:

## I.  INTRODUCTION AND AGENT BACKGROUND

1.  I have been a Postal Inspector since April 2012.  I am currently assigned to the Sacramento Domicile, San Francisco Division, of the United States Postal Inspection Service ("USPIS").  My current assignment is to investigate the unlawful transportation of contraband, including controlled substances and proceeds of the sale of controlled substances, through the United States Mail.

2.  I attended the United States Postal Inspection Service Basic Inspector Training in Potomac, Maryland.  I also completed a forty-hour Prohibited Mailings Narcotics training with the United States Postal Inspection Service.  Through my training, experience, and interaction with other experienced Postal Inspectors, Task Force Officers, and other drug investigators, I have become familiar with the methods employed by drug traffickers to smuggle, safeguard, store, transport, and distribute drugs; to collect and conceal drug-related proceeds; and to communicate with other participants to accomplish such objectives. I have received specialized training in narcotics investigation matters including, but not limited to, drug interdiction, drug detection, and money laundering techniques and schemes.

3.  I have participated in at least thirty investigations targeting individuals and organizations trafficking heroin, cocaine, marijuana, methamphetamine, and other controlled substances. During the course of these investigations, I have become familiar with the manner in which drug traffickers use the mail to conduct their illegal operations.  I have written at least one hundred search warrants related to parcel interdiction efforts.

4.  I am a "Federal law enforcement officer" within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a federal law enforcement agent engaged in enforcing criminal laws and authorized to request a search warrant.

## II.  PURPOSE

5.  The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.  Rather, I make this affidavit in support of an application for a warrant to search:

> **(1) 343 Sawtell Road, Roseville, CA 95678 (hereafter referred to as the SUBJECT RESIDENCE), further described in Attachment A-1;**

> **(2) a 2018 Grey in color Honda Civic with paper dealership license plate "Elk Grove Honda", bearing Vehicle Identification Number ("VIN") 2HGFC2F71JH544412 (hereafter referred to as SUBJECT VEHICLE 1), further described in Attachment A-2;**

> **(3) a 2012 Grey in color Hyundai Sonata, California license plate 6VOB671, bearing Vehicle Identification Number ("VIN") KMHEC4A42CA025191 (hereafter referred to as SUBJECT VEHICLE 2), further described in Attachment A-3;**

> **the seizure of the items described in Attachment B;**

> **and,**

> **a criminal complaint naming XAVIER ALEXANDER SPEROPOULOS and LAUREN CROWE.**

> For violations of:

a.  Title 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance);

b.  Title 21 U.S.C. § 846 (Conspiracy to Distribute a Controlled Substance).

### III.   <u>OVERVIEW</u>

6.    During this investigation, Federal Law Enforcement Officers have: (1) observed XAVIER ALEXANDER SPEROPOULOS ("SPEROPOULOS"), and his co-conspirator LAUREN CROWE ("CROWE"), place parcels containing narcotics into the United States Postal Service ("USPS") mail system; (2) conducted four undercover purchases of marijuana from dark web marketplace vendors believed to be controlled by SPEROPOULOS and CROWE. In doing so, SPEROPOULOS and CROWE are:

      a. Distributing controlled substances.

           i. Under 21 U.S.C. § 841(a)(1), "it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

      b. Conspiring to distribute controlled substances.

           i. Under 21 U.S.C. § 846, "any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

### IV.   <u>TECHNICAL BACKGROUND</u>

7.    Digital currency (also known as crypto-currency) is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency (i.e. currency created and regulated by a government.) Digital currency exists entirely on the Internet and is not stored in any physical form. Digital currency is not issued by any government, bank, or company and is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Digital currency is not illegal in the United States and may be used for legitimate financial transactions. However, digital currency is often used for conducting illegal transactions, such as the sale of controlled substances.

8.    Bitcoin is a type of digital currency.  Bitcoin payments are recorded in a public ledger that is maintained by peer-to-peer verification and is thus not maintained by a single administrator or entity.  Individuals can acquire Bitcoins either by "mining" or by purchasing Bitcoins from other individuals.  An individual can "mine" for Bitcoins by allowing his/her computing power to verify and record the Bitcoin payments into a public ledger.  Individuals are rewarded for this by being given newly created Bitcoins.

9.    An individual can send and receive Bitcoins through peer-to-peer digital transactions or by using a third-party broker.  Such transactions can be done on any type of computer, including laptop computers and smart phones.

10.    Bitcoins can be stored in digital "wallets."  A digital wallet essentially stores the access code that allows an individual to conduct Bitcoin transactions on the public ledger.  To access Bitcoins on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key.")  The public address can be analogized to an account number while the private key is like the password to access that account.

11.    Even though the public addresses of those engaging in Bitcoin transactions are recorded on the public ledger, the true identities of the individuals or entities behind the public addresses are not recorded.  If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity.  Bitcoin transactions are, therefore, described as "pseudonymous," meaning they are partially anonymous.

12.    Through the dark web or darknet, i.e. websites accessible only through encrypted means, individuals have established online marketplaces, such as the Silk Road, for narcotics and other illegal items.  These markets often only accept payment through digital currencies, such as Bitcoin.  Accordingly, a large amount of Bitcoin sales or purchases by an individual is often an indicator that the individual is involved in narcotics trafficking or the distribution of other illegal items.  Individuals intending to purchase illegal items on Silk Road-like websites need to purchase or barter for Bitcoins.  Further, individuals who have received Bitcoin as proceeds of illegal sales on Silk Road-like websites need to sell their Bitcoin to convert them to fiat

(government-backed) currency. Such purchases and sales are often facilitated by peer-to-peer Bitcoin exchangers who advertise their services on websites designed to facilitate such transactions.

13. Dark web sites, such as Silk Road, AlphaBay, Wall Street, and Dream, operate on "The Onion Router" or "TOR" network. The TOR network ("TOR") is a special network of computers on the Internet, distributed around the world, that is designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing the network, and, thereby, the locations and identities of the network's users. TOR likewise enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, which are referred to as "hidden services" on the TOR network. Such "hidden services" operating on TOR have complex web addresses, which are many times generated by a computer algorithm, ending in ".onion" and can only be accessed through specific web browser software designed to access the TOR network.


## V.    FACTS ESTABLISHING PROBABLE CAUSE

### A.  *Exploratory purchases of the NCIDE task force*

14. I am part of the Northern California Illicit Digital Economy (NCIDE) task force of Homeland Security Investigations ("HSI"), the Federal Bureau of Investigation ("FBI"), the Drug Enforcement Administration ("DEA") and the United States Postal Inspection Service ("USPIS"). As a function of this task force, investigators regularly purchase narcotics utilizing both digital and fiat currencies, from the persons operating and illegally selling narcotics on the "clear" portion of the internet, from the "dark" portion of the internet and from various social media platforms. Investigators conduct the undercover purchases of narcotics to assist in the effort to identify the suspects operating such illicit sites.

15. On or about July 01, 2018, the NCIDE task force opened a joint investigation of DankStix ("DANKSTIX") a Dream Market based vendor involved in shipping controlled substances via the USPS.

16.     DANKSTIX joined the Dream marketplace on October 09, 2017 and offers marijuana products in various forms to include cartridges, wax, THC powder, "terpene sauce," pre-rolled weed cigars, and marijuana buds up to pound quantities. As of January 10, 2019, DANKSTIX has 1050 reviews with a rating of 4.88 out of 5 stars.

17.     DANKSTIX regularly posts on the Dread dark web forums and allows direct deals through the Wickr encrypted chat application. During the course of this investigation, case agents have placed orders from DANKSTIX on the Dream marketplace as well as through Wickr.

18.     On July 03, 2018, law enforcement placed an order with DANKSTIX on the Dream Market to purchase a half pound of marijuana. The undercover buy was conducted using Bitcoin as payment. On July 07, 2018, law enforcement received the undercover purchase via the USPS mail. The parcel was a USPS Priority Mail Padded Flat Rate Envelope which listed the sender name as "RICHARD TIMA 5240 FITZWILLIAM WAY SACRAMENTO CA 95823-4122". Once opened, law enforcement discovered the parcel contained a mylar bag. Inside the mylar bag, was a clear, vacuum sealed, food-saver style plastic bag which contained suspected marijuana. The weight of the marijuana, including the plastic bag, was determined to be 240 grams.

19.     On September 25, 2018, law enforcement placed an order with DANKSTIX on the Dream Market to purchase a half pound of marijuana. The undercover buy was conducted using Bitcoin as payment. On September 28, 2018, law enforcement received the undercover purchase via the USPS mail. The parcel was a USPS Priority Mail Padded Flat Rate Envelope which listed the sender name as "ARIANNA GRAZIA SMITH 5265 MADDUX WAY ROSEVILLE, CA 95747-9298". Once opened, law enforcement discovered the parcel contained a mylar bag. Inside the mylar bag, was a clear, vacuum sealed, food-saver style plastic bag which contained suspected marijuana. The weight of the marijuana, including the plastic bag, was determined to be 264 grams.

20.    On October 29, 2018, law enforcement placed an order with DANKSTIX through Wickr to negotiate a direct deal purchase of marijuana. The undercover buy was conducted using Bitcoin as payment.  On November 2, 2018, law enforcement received the undercover purchase via the USPS mail.  The parcel was a USPS Priority Mail Padded Flat Rate Envelope which listed the sender name as "LAURIE MILTON 1207 WILLIAM WAY ROSEVILLE CA 95678-2022".  Once opened, law enforcement discovered the parcel contained a mylar bag.  Inside the mylar bag, was a clear, vacuum sealed, food-saver style plastic bag which contained suspected marijuana.  The weight of the marijuana, including the plastic bag, was determined to be 300 grams.

21.    On November 10, 2018, law enforcement placed an order with DANKSTIX on the Dream Market to purchase a quarter pound of marijuana.  The undercover buy was conducted using Bitcoin as payment.  On November 16, 2018, law enforcement received the undercover purchase via the USPS mail.  The parcel was a USPS Priority Mail Padded Flat Rate Envelope which listed the sender name as "DANIEL EVANS 236 DIAMOND OAKS RD ROSEVILLE CA 95678-1007".  Once opened, law enforcement discovered the parcel contained a mylar bag.  Inside the mylar bag, was a clear, vacuum sealed, food-saver style plastic bag which contained suspected marijuana.  The weight of the marijuana, including the plastic bag, was determined to be 131 grams.

### B.    *Shipper identification and surveillance*

22.    On or about October 16, 2018, USPIS analysts, using USPIS tools and databases, identified two email addresses used by DANKSTIX, dankstix@secmail[.]pro and dankstix@protonmail[.]com.  Using USPS tools, analysts identified a USPS customer registration account using the email address dankstix@secmail[.]pro.  The following identifiers were associated with the customer:
- User ID: 152255657
- User name: ryanjones12
- Name/Company: ryan jones
- Address: 12231 Main St., Unit 911, San Antonio, FL 33576-7242

- Phone: (800) 384-9382
- Email: dankstix@secmail[.]pro
- Last Login Date: July 19, 2018
- Internet Protocol (IP) address: 207.189.24.180

23.     The physical address used in the customer registration account is the address of a USPS
Post Office in San Antonio, FL. The IP address used to create the account is associated with a
Virtual Private Network (VPN) provider and is used to obfuscate the account user's activity.
The same IP address was used on USPS systems approximately three minutes earlier to access a
different USPS customer registration account. The following identifiers were associated with the
customer:

- User ID: 112807844
- User Name: speropoulos1
- Name/Company: Mr Xavier a speropoulos/javiresell
- 244 Halley Glen Dr., Roseville, CA 95678-6046
- Phone: (916) 472-8757
- Email: speropoulos@gmail[.]com
- Last Login Date: August 8, 2018
- Internet Protocol (IP) address:
    o   2601.204:e000:1ad0:18ee:8ee2:6717:2143 (August 8, 2018)
    o   207.189.24.180 (July 19, 2018)

24.     The customer registration account was also associated with a second physical address, 5
Marcia Way Apt. 222, Roseville, CA 95747. It appeared that the user may have been attempting
to change the address within the USPS customer registration interface but did not submit an
official USPS Change of Address request. USPS records revealed SPEROPOULOS has address
histories at both the 244 Haley Glen Dr., Roseville, CA 95678 and the 5 Marcia Way Apt. 222,
Roseville, CA 95747 addresses.

25.     A search for the address, "5 Marcia Way Apt. 222, Roseville, CA 95747" was conducted,
using an online public and proprietary records database to verify names and addresses. That

search confirmed SPEROPOULOS and CROWE associate to the address. During the course of the investigation law enforcement discovered SPEROPOULOS and CROWE moved from "5 Marcia Way Apt. 222, Roseville, CA 95747" to the SUBJECT RESIDENCE on or about November 13, 2018. This was later confirmed through surveillance and an official USPS Change of Address form submitted to the USPS.

26.     Law enforcement conducted open source databases and/or social media inquiries and located several social media accounts associated to SPEROPOULOS and CROWE. Those social media accounts indicate that SPEROPOULOS and CROWE are romantically involved. In one such site, SPEROPOULOS indicates, "I want to create a community for the crypto hobbyist and stoner enthusiasts. With discussion and good vibes all around".



**Photo 1 – SPEROPOULOS and CROWE**

27.     US Postal Inspectors conducted an in depth review of all the of sender names, sender addresses, parcel label similarities, packaging similarities, and mailing location data and determined in total, between July 2018 and January 10, 2019, US Postal Inspectors identified over 250 parcels mailed by DANKSTIX. A large amount the DANKSTIX parcels were mailed

9

using USPS Priority Mail Padded Flat Rate Envelopes. USPS Priority Mail Padded Flat Rate Envelopes are not readily available to USPS customers in post office lobbies and have to be specifically ordered through USPS. A search in USPS records and databases determined the postage for all of the DANKSTIX parcels was provided by "easypost" or "shippo" (online postage providers), through a third party vendors that sells postage online and accepts Bitcoin as payment.

28.     On or about October 18, 2018, US Postal Inspectors discovered four suspected narcotics parcels associated to DANKSTIX, with the return address of "JOHN MURPHY 7476 THOUSAND OAKS DR LINCOLN, CA 95648" were mailed from the Lincoln post office located at 200 Gateway Drive, Lincoln, CA 95648. Law enforcement noticed several anomalies that, based on their training and experience, are characteristics of parcels containing controlled substances. Law enforcement reviewed the surveillance video at the Lincoln post office and determined CROWE mailed the four parcels.



**Photo 2 – CROWE entering the Lincoln post office**

29.     On November 13, 2018, law enforcement conducted surveillance at the SUBJECT
RESIDENCE.  At approximately 11:18 a.m., SPEROPOULOS departs the SUBJECT
RESIDENCE in SUBJECT VEHICLE 1.  Law enforcement conducted mobile surveillance and
followed SUBJECT VEHICLE 1 to Community Health Solutions located at 5852 88th Street,
Sacramento, CA 95828, which is a medical marijuana dispensary.  I believe that
SPEROPOULOS is employed at this business.

30.     At approximately 1:23 p.m., CROWE departs the SUBJECT RESIDENCE in SUBJECT
VEHICLE 2.  Law enforcement conducted mobile surveillance and followed CROWE to several
business establishments in Roseville, CA.  At approximately 3:12 p.m., law enforcement
observed CROWE enter the Lincoln post office located at 200 Gateway Drive, Lincoln, CA
95648 carrying a white USPS postal tub. US Postal Inspectors determined five suspected
narcotics parcels associated to DANKSTIX with the return address of "5500 BIG HILL RD
LINCOLN CA 95648" were mailed from the Lincoln post office.   Law enforcement noticed
several anomalies that, based on their training and experience, are characteristics of parcels
containing controlled substances.   Law enforcement reviewed the surveillance video at the
Lincoln post office and determined CROWE mailed the five parcels.



**Photo 3 – CROWE entering the Lincoln post office**

31.　Law enforcement continued mobile surveillance on CROWE in SUBJECT VEHICLE 2. At approximately 3:43 p.m., law enforcement observed CROWE enter the Rocklin post office located at 5515 Pacific Street, Rocklin, CA 95677 carrying a white USPS postal tub.　At approximately 3:48 p.m., law enforcement entered the Rocklin post office and observed five parcels that had been deposited into the parcel drop box.　Law enforcement noticed several anomalies that, based on their training and experience, are characteristics of parcels containing controlled substances.　Law enforcement photographed the five suspected narcotics parcels and noted they all bore the return address of "MICHAEL HAKEEM BAKER 1708 BRODEA LN, ROCKLIN CA 95765-5585".　At approximately 7:02 p.m., CROWE returned to the SUBJECT RESIDENCE in SUBJECT VEHICLE 2.

32.　On or about November 28, 2018, US Postal Inspectors discovered three suspected narcotics parcels associated to DANKSTIX, with the return address of "NATALIE SINGLETON 2573 OLD KENMARE RD LINCOLN CA 95648" were mailed from the Lincoln post office located at 200 Gateway Drive, Lincoln, CA 95648.　Law enforcement noticed several anomalies that, based on their training and experience, are characteristics of parcels containing controlled substances.　Law enforcement reviewed the surveillance video at the Lincoln post office and determined CROWE mailed the three parcels.



**Photo 4 – CROWE entering the Lincoln post office**

33. On November 29, 2018, law enforcement conducted surveillance at the SUBJECT RESIDENCE. At approximately 1:30 p.m., an orange in color Kia Soul bearing California license plate 6URR607 arrived at the SUBJECT RESIDENCE, operated by an unknown Caucasian female. At approximately 2:05 pm., CROWE and the unknown Caucasian female exit the SUBJECT RESIDENCE and depart in the Kia Soul. Law enforcement conducted mobile surveillance and followed the Kia Soul to the leasing office of their old apartment complex located at 5 Marcia Way, Roseville, CA 95747. At approximately 2:10 p.m., the Kia Soul departs the leasing office and law enforcement continue mobile surveillance. At approximately 2:24 p.m., the Kia Soul arrives at the Rocklin post office located at 5515 Pacific Street, Rocklin, CA 95677. CROWE exists the Kia Soul with several boxes and enters the Rocklin post office. At approximately 2:25 p.m., law enforcement enter the Rocklin post office and observed four parcels that had been deposited into the parcel drop box. Law enforcement noticed several anomalies that, based on their training and experience, are characteristics of parcels containing controlled substances. Law enforcement photographed the four suspected narcotics parcels and noted they all bore the return address of "STEVE LAWTON RIDGEWAY 5040 3RD ST ROCKLIN CA 95677-2313".

13

34. On or about December 04, 2018, US Postal Inspectors discovered nine suspected narcotics parcels associated to DANKSTIX that were mailed from the Lincoln post office located at 200 Gateway Drive, Lincoln, CA 95648. Five of the nine parcels had the return address of "JAMES HUNTER 1190 TOYON CIR LINCOLN CA 95648" and the other four had the return address of 'RONALD BAUGH 1670 DELTA WIND LN LINCOLN CA 95648". Law enforcement noticed several anomalies that, based on their training and experience, are characteristics of parcels containing controlled substances. Law enforcement reviewed the surveillance video at the Lincoln post office and determined SPEROPOULOS mailed the nine parcels.



**Photo 5 – SPEROPOULOS entering the Lincoln post office**

35. On December 10, 2018, law enforcement took custody of the USPS Priority Mail Padded Flat Rate Envelope bearing tracking number 9405 5368 9784 6589 9363 56 with the return address of 'RONALD BAUGH 1670 DELTA WIND LN LINCOLN CA 95648" ("DECEMBER PARCEL") that was mailed by SPEROPOULOS at the Lincoln post office on December 03, 2018.

14

36.     On December 12, 2018, law enforcement secured a federal search warrant (2:18-SW-1009-AC) to open the DECEMBER PARCEL and examine its contents. Later that day, law enforcement executed the search warrant on the DECEMBER PARCEL. Once opened, law enforcement discovered the parcel contained a mylar bag. Inside the mylar bag, was a clear, vacuum sealed, food-saver style plastic bag which contained suspected concentrated marijuana/THC. The weight of the marijuana, including the plastic bag, was determined to be 10 grams.

37.     On January 02, 2019, law enforcement conducted surveillance at the Lincoln post office, located at 200 Gateway Drive, Lincoln, CA 95648. At approximately 12:35 p.m., law enforcement observed CROWE arrive at the Lincoln post office in SUBJECT VEHICLE 1. At approximately 12:36 p.m., CROWE is observed exiting SUBJECT VEHICLE 1 carrying a white USPS postal tub and entering the Lincoln post office. CROWE exits the post office a short time later carrying a white postal tub. CROWE then gets into SUBJECT VEHICLE 1 and drives to the blue collection box positioned in front of the post office. CROWE deposits three parcels into the blue collection box and exits the facility.



**Photo 6 – CROWE mailing at the Lincoln post office**

38. US Postal Inspectors immediately retrieved all the parcels mailed by CROWE and photographed them. CROWE mailed a total of eight parcels. Five parcels were mailed from inside the post office lobby drop box which all had the same return address "CECILIA M GROVE 177 I ST LINCOLN CA 95648-1728" and going to destinations I know to be regions where drugs are often shipped from California (New York, North Carolina, Kentucky and Ohio). Three parcels were deposited into the blue collection box which all had the same return address "EMILY LEWIS 6222 LONETREE BLVD ROCKLIN CA 95765-3790" and going to destinations I know to be regions where drugs are often shipped from California (Arkansas, South Carolina and Washington D.C.). When handling the parcels dropped off by CROWE, many of the parcels had a strong odor of marijuana emanating from their contents. Out of the eight parcels mailed by CROWE, law enforcement detained one parcel ("JANUARY PARCEL") for further investigation and placed the remaining seven parcels back into the USPS mail stream.

39. On January 04, 2018, law enforcement secured a federal search warrant to open the JANUARY PARCEL and examine its contents. Later that day, law enforcement executed the search warrant on the JANUARY PARCEL. Once opened, law enforcement discovered the parcel contained two mylar bags. Inside both mylar bags, was a clear, vacuum sealed, food-saver style plastic bag which contained suspected marijuana. The weight of first bag of suspected marijuana was 491 grams. The weight of the second bag of suspected marijuana was 73 grams. The combined weight of the marijuana, including the plastic bag, was determined to be 564 grams.

### C. *December 11, 2018 trash pull of SUBJECT RESIDENCE*

40. On December 11, 2018, law enforcement conducted a trash pull at the SUBJECT RESIDENCE. Inside the trash, law enforcement observed and photographed numerous items that based upon their training and experience were indicative of narcotics trafficking. Law enforcement observed; marijuana remnants, marijuana stems, vacuum sealer rolls, turkey bags, used rubber gloves, "DYMO" 4" x 6"shipping labels, oxygen indicators, empty box of rubber gloves, indicia in SPEROPOULOS' name, a brown "Amazon" shipping box addressed to "Xavier Speropoulos 343 Sawtell Rd Roseville, CA 95678-7181", and a large amount of

discarded "TO EXPOSE ADHESIVE REMOVE LINERS" that I know through my training and experience come from USPS Priority Mail Padded Flat Rate Envelopes. USPS Priority Mail Padded Flat Rate Envelopes are self-adhesive in which the liner is removed to seal the parcel. As previously noted, a large amount the parcels attributed to DANKSTIX were mailed with USPS Priority Mail Padded Flat Rate Envelopes. USPS Priority Mail Padded Flat Rate Envelopes are not readily available to USPS customers in post office lobbies and have to be specifically ordered through USPS.



**Photo 6 – Trash pull**

D. *USPS Victory Packing Shipping records*

41. A search of USPS records and databases revealed six orders of USPS Priority Mail Padded Flat Rate Envelopes were shipped to SPEROPOULOS and CROWE. On or about August 09, 2018 and August 29, 2018, USPS mailed SPEROPOULOS two orders totaling 190 USPS Priority Mail Padded Flat Rate Envelopes to 244 Halley Glen Dr. Roseville, CA 95678. On or about August 09, 2018 and August 29, 2018, USPS mailed CROWE two orders totaling 190 USPS Priority Mail Padded Flat Rate Envelopes to 5 Marcia Way Apt. 222 Roseville, CA

95678. On December 05, 2018, USPS mailed CROWE two orders totaling 190 USPS Priority Mail Padded Flat Rate Envelopes to the SUBJECT RESIDENCE.

## VI.    METHODS AND MEANS OF USING THE UNITED STATES MAIL

42.    Based on my experience, training, and discussions with other law enforcement officers experienced in drug investigations, I know that certain indicators exist when persons use the United States Mail to ship controlled substances from one location to another. Indicators for parcels that contain controlled substances and/or proceeds from controlled substances include, but are not limited to, the following:

a.  It is common practice for shippers of the controlled substances to use Express Mail and Priority Mail because the drugs arrive at the destination more quickly and on a predictable date. Express Mail and Priority Mail, when paired with a special service such as delivery confirmation, allow traffickers to monitor the progress of the shipment of controlled substances. Traffickers pay for the benefit of being able to confirm the delivery of the parcel by checking the Postal Service Internet website and/or calling the local post office.

b.  Packages containing controlled substances or proceeds have, in many instances, a fictitious return address, incomplete return address, no return address, a return address that is the same as the addressee address, or a return address that does not match the place from which the parcel was mailed. These packages are also sometimes addressed to or from a commercial mail receiving agency (*e.g.*, Mail Boxes Etc.). A shipper may also mail the parcel containing controlled substances from an area different from the return address on the parcel because: (1) the return address is fictitious or (2) the shipper is attempting to conceal the actual location from which the parcel was mailed. These practices are used by narcotics traffickers to hide from law enforcement officials the true identity of the persons shipping and/or receiving the controlled substances or proceeds.

c.  Individuals involved in the trafficking of controlled substances through the United States Mail will send and receive Express or Priority mailings on a more frequent basis than a

normal postal customer. Drug traffickers use Express Mail and Priority Mail at a higher rate due to their frequent exchanges of controlled substances and the proceeds from the sale of these controlled substances.

d. In order to conceal the distinctive smell of controlled substances from narcotics detection dogs, these packages tend to be wrapped excessively in bubble-pack and wrapping plastic, and are sometimes sealed with the use of tape around all seams. In addition, the parcels often contain other smaller parcels which are carefully sealed to prevent the escape of odors. Perfumes, coffee, dryer sheets, tobacco, or other substances with strong odors are also sometimes used to mask the odor of the controlled substances being shipped. Drug traffickers often use heat/vacuum sealed plastic bags, and/or re-sealed cans in an attempt to prevent the escape of orders.

e. California is typically a source state for drugs, especially marijuana. It is common for individuals in California to mail parcels containing narcotics to other states and then receive mail parcels containing cash payments in return.

43. Based on my training and experience, I know that parcels shipped by drug traffickers sometimes contain information and documentation related to the sales and distribution of controlled substances. The documentation can include, but is not limited to, information and instructions on the breakdown and distribution of the controlled substances at the destination; information on the use and effects of the various controlled substances; information about the actual sender; pay/owe sheets; and information and instructions for ordering future controlled substances.

44. Drug traffickers who use the United States Mail and other carriers as a means of distributing controlled substances, paraphernalia, and proceeds, and as a means of communicating with co-conspirators often include the following in parcels relating to their trafficking activity, all of which are evidence, fruits, proceeds, and/or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 843(b), and 846:

a. Controlled substances, including heroin, cocaine, methamphetamine, and marijuana.

b. Packaging, baggies, and cutting agents, including items used to conceal the odor of narcotics, such as perfumes, coffee, dryer sheets, tobacco, or other substances with a strong odor.

c. Records reflecting the mailing or receipt of packages through Express Mail, Priority Mail, Federal Express, UPS or any other common carrier.

d. United States and foreign currency, securities, precious metals, jewelry, stocks, bonds, in amounts exceeding $500, including financial records related to the laundering of illicitly obtained monies and/or other forms of assets, including United States currency acquired through the sales, trafficking, or distribution of controlled substances.

e. Records reflecting or relating to the transporting, ordering, purchasing, and/or distribution of controlled substances, including but not limited to books, receipts, notes, ledgers, pay and owe sheets, correspondence, records noting price, quantity, date and/or times when controlled substances were purchased, possessed, transferred, distributed, sold or concealed.

f. Records reflecting or relating to co-conspirators, including but not limited to personal notes, correspondence, cables, telegrams, personal address lists, listings of telephone numbers, and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates and conspirators in controlled substance trafficking activities.

g. Indicia or other forms of evidence showing dominion and control, or ownership of mail parcels, locations, vehicles, storage areas, safes, lock boxes, and/or containers related to the storage of controlled substances or proceeds.

# VII.   SEARCH OF DIGITAL INFORMATION

45.   Your affiant is aware that users and vendors of online black markets use a computer to access the dark web where online black markets are located.  Your affiant is also aware that individuals must use an electronic device to locate and communicate with bitcoin exchangers and purchase bitcoins.  Users have to establish an account on an online black market's website to purchase goods and also establish accounts to initiate initial trades with bitcoin exchangers. Users also must establish electronic wallets to receive and send bitcoins to purchase drugs. These wallets are electronic in nature and may be stored on mobile devices (phones or tablets), external or removable media, and/or computers.  Your affiant is aware that once contact is made with a bitcoin exchanger on a digital currency exchange platform such as localbitcoins.com, all subsequent contact and transactions can be conducted from one phone to the other during a face to face transaction, exchanging currency for bitcoins.  Your affiant is also aware that users can back-up wallets to paper printouts that would contain information to restore the wallet in an electronic form (cold storage).  Passwords for access to online black markets, as well as for electronic wallets, are typically complex and are often written down or saved in an accessible manner on paper or on some electronic device. Your affiant believes that these are located in the SUBJECT RESIDENCE, SUBJECT VEHICLE 1, SUBJECT VEHICLE 2 and on the persons of SPEROPOULOS and CROWE.

46.   As described above and in Attachment B, your affiant submits that computers, smart phones, and possibly other storage media will be found within the SUBJECT RESIDENCE, SUBJECT VEHICLE 1, SUBJECT VEHICLE 2 and on the persons of SPEROPOULOS and CROWE and there is probable cause to search and seize those items for the reasons stated below. Some of these electronic records might take the form of files, documents, and other data that is user-generated.  Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.  Furthermore, your affiant submits that sufficient probable cause has been established to search and seize any online black-market vendor accounts, online digital currency exchange platform accounts, and the data contained therein.  Due to the inherent illicit and anonymous nature of these accounts, and that there is no

identified service provider for these accounts, legitimate, compliant or not, to which legal process may be served; your affiant believes this to be the only manner to recover said evidence.

47. For example, based on my knowledge, training, and experience, your affiant is aware that a powered-on computer maintains volatile data. Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks (floppy, tape and/or CD-ROM), and printing activity. Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed. Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

48. Based on my knowledge, training, and experience, your affiant knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little to no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

49. Also, again based on your affiant's training and experience, wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because

special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

50. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

51. Thus, the forensic analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

52. In cases of this sort, laptop computers and/or smartphones are also used as instrumentalities of the crime to commit offenses involving interstate drug sales and movement of drug proceeds. Devices such as modems and routers can contain information about dates, frequency, and computer(s) used to access the Internet. The laptop or smart phone may also have fingerprints on them indicating the user of the computer and its components.

53.     Similarly, files related to the purchasing and selling of controlled substances, as well as,
the movement of currency found on computers and other digital communications devices are
usually obtained from the Internet or the cellular data networks using application software which
often leaves files, logs or file remnants which would tend to show the identity of the person
engaging in the conduct as well as the method of location or creation of the data, search terms
used, exchange, transfer, distribution, possession or origin of the files. Files that have been
viewed via the Internet are sometimes automatically downloaded into a temporary internet
directory or "cache". The browser often maintains a fixed amount of hard drive space devoted to
these files, and the files are only overwritten as they are replaced with more recently viewed
internet pages or if a user takes steps to delete them. Thus, the ability to retrieve residue of an
electronic file from a hard drive depends less on when the file was downloaded or viewed than
on a particular user's operating system, storage capacity, and computer habits.

54.     "User attribution" evidence can also be found on a computer and is analogous to the
search for "indicia of occupancy" while executing a search warrant at a residence. For example,
registry information, configuration files, user profiles, e-mail, e-mail address books, "chat,"
instant messaging logs, photographs, and correspondence (and the data associated with the
foregoing, such as file creation and last accessed dates) may be evidence of who used or
controlled the computer or storage medium at a relevant time. Your affiant knows from training
and experience that digital software or hardware exists that allows persons to share digital access
over wired or wireless networks allowing multiple persons to appear on the Internet from the
same IP address. Examination of these items can reveal information about the authorized or
unauthorized use of internet connection at the residence.

55.     Searching the computer(s) for the evidence described in the attachment may require a
range of data analysis techniques. For example, information regarding user attribution or
internet use is located in various operating system log files that are not easily located or
reviewed. In addition, a person engaged in criminal activity will attempt to conceal evidence of
the activity by "hiding" files or giving them deceptive names. As explained above, because the
warrant calls for records of how a computer has been used, what it has been used for, and who
has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to

obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this location (the computer) for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

56. Based upon knowledge, training and experience, your affiant knows that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

57. The nature of evidence: As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

58. The volume of evidence and time required for an examination: Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used,

what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

59. Technical requirements: Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off- site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

60. Variety of forms of electronic media: Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

61. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to, computer-assisted scans of the entire medium that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## VIII. REQUEST FOR SEALING

62. Finally, your affiant respectfully requests that this Court issue an order restricting, until further order of the Court, this case, to include, the Application and Search Warrant. I believe

that restricting these documents are necessary to protect the identity of cooperating individuals, because the items and information to be seized are relevant to an ongoing investigation into a criminal organization, and not all of the targets of this investigation will be searched at this time. Based upon my training and experience, your affiant has learned that online criminals actively search for criminal Affidavits and Search Warrants via the Internet and disseminate them to others actively seeking out information over the Web and other sources concerning law enforcement activity in this arena. Accordingly, premature disclosure of the contents of this Affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## IX. CONCLUSION

63. Based on the facts set forth in this Affidavit, I believe there is probable cause that evidence, fruits, proceeds, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance), and 21 U.S.C. § 846 (Conspiracy to Distribute a Controlled Substance) are concealed in the locations identified in Attachment A-1, A-2 and A-3. Accordingly, I respectfully request the issuance of a search warrant authorizing the search of the locations described in Attachments A-1, A-2 and A-3, as well as the items described in Attachment B.

### *[CONTINUED ON NEXT PAGE]*

64.   Furthermore, I believe that there is probable cause that XAVIER ALEXANDER

SPEROPOULOS and LAUREN CROWE committed those same crimes, thus supporting the

legal basis for the Court to issue an arrest warrant based on a criminal complaint.

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best
of my knowledge, information, and belief.


Trevor R. Covert
United States Postal Inspector

Sworn and Subscribed to me on January ___, 2019

The Honorable Edmund F. Brennan
United States Magistrate Judge

Approved as to form:

Grant Rabenn
Assistant U.S. Attorney

**ATTACHMENT A-1**

**LOCATION TO BE SEARCHED**

SUBJECT RESIDENCE – The residence at **343 Sawtell Road Roseville, CA 95678** – The property is further described as a four bedroom, 3 bathroom, single family home in Roseville, California. The residence bears grey siding with white trim. The home has 343 displayed on the front of the home.



The place to be searched includes all rooms, attics, basements, and all other parts therein, and surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the SUBJECT RESIDENCE; any computer, digital devices, and digital media located therein, where the items specified in Attachment B may be found; all vehicles located at the SUBJECT RESIDENCE which fall under the dominion and control of the person or persons associated with the SUBJECT RESIDENCE; and all internal and external compartments and all containers that may be associated with the storage of controlled substances or the proceeds of the sales of controlled substances or their instrumentalities contained within the aforementioned place.

## ATTACHMENT A-2
## LOCATION TO BE SEARCHED

SUBJECT VEHICLE 1 – **A 2018 Grey in color Honda Civic with paper dealership license plate "Elk Grove Honda", bearing Vehicle Identification Number ("VIN") 2HGFC2F71JH544412**, registered to Honda Lease Trust LSR and Xavier A. Speropoulos LSE at 5 Marcia Way Apt 222 Roseville, CA 95747. The Honda Civic is grey in color and has four doors.



The search of SUBJECT VEHICLE 1 is to include all internal and external compartments and all containers that may be associated with the storage of controlled substances, proceeds of controlled substances sales, digital media, or their instrumentalities contained within the aforementioned vehicle.

## ATTACHMENT A-3
## LOCATION TO BE SEARCHED

SUBJECT VEHICLE 2 – A **2012 Grey in color Hyundai Sonata, California license plate 6VOB671, bearing Vehicle Identification Number ("VIN") KMHEC4A42CA025191** registered to Virginia K. Crowe at 5 Marcia Way Apt 222 Roseville, CA 95747. The Hyundai Sonata is grey in color and has four doors.



The search of SUBJECT VEHICLE 2 is to include all internal and external compartments and all containers that may be associated with the storage of controlled substances, proceeds of controlled substances sales, digital media, or their instrumentalities contained within the aforementioned vehicle.

## ATTACHMENT B
## ITEMS TO BE SEIZED

The following records, documents, files, or materials, in whatever form, including handmade or mechanical form (such as printed, written, handwritten, or typed); photocopies or other photographic form; and electrical, electronic, and magnetic form (such as computers, hard drives, flash drives, tapes, cassettes, hard disks, floppy disks, diskettes, compact discs, CD-ROMs, DVDs, optical discs, Zip cartridges, printer buffers, smart cards, or electronic notebooks, or any other electronic storage medium) that constitute or contain evidence, instrumentalities, or fruits of violations of 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance); 21 U.S.C. § 846 (Conspiracy to Distribute a Controlled Substance).

1.      All records relating to the violations described above, including:

a.      any and all documents, records or information relating to the purchase, sale, importation, possession, shipment, tracking, delivery or distribution of controlled substances;

b.      any and all documents, records or information relating to the purchase, sale, importation, possession, shipment, tracking, delivery or distribution of packaging materials;

c.      any and all documents, records or information relating to the purchase, sale, tracking, delivery or distribution of postage or express mail consignment;

d.      any and all documents, records or information relating to the transfer, purchase, sale or disposition of virtual currency;

e.      any and all documents, records, or information relating to the access, creation and maintenance of websites and hidden (Tor-based) services;

f.     any and all documents, records, or information relating to email accounts used in furtherance of these offenses;

g.     any and all records or other items which are evidence of ownership or use of computer equipment, including, but not limited to, sales receipts, bills for internet access, handwritten notes and handwritten notes in computer manuals.

h.     any and all records relating to indicia of occupancy, residency, and ownership or use of the SUBJECT RESIDENCE, SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2, including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, identification documents, and keys;

i.     any and all records of any address and/or telephone books, rolodex indicia, electronic organizers, telephone paging devices and the memory thereof, and any papers, records or electronic data reflecting names, addresses, telephone numbers, pager numbers of co-conspirators, sources of controlled substances and/or virtual currency, identifying information for customers purchasing controlled substances and/or virtual currency;

j.     all bank records, checks, credit card bills, account information, safe deposit box information and other financial records;

k.     all copies of income tax returns filed with the Internal Revenue Service (IRS) or the California Franchise Tax Board;

l.     all records related to the purchase of real estate or other assets, or the leasing of storage units,

m.     financial records for  including foreign and domestic banking records, ledger books, wire transfer instructions, and receipts for wire transfers,

n.     bulk cash in excess of $1,000.

2.     Any digital devices or other electronic storage media and/or their components used as a means to commit the violations described above, including:

a.     any digital device or other electronic storage media capable of being used to commit, further, or store evidence or fruits of the offenses listed above;

b.     any digital devices or other electronic storage media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, cameras, printers, plotters, encryption devices, and optical scanners;

c.     any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d.     any documentation, operating logs and reference manuals regarding the operation of the digital device or other electronic storage media or software;

e.     any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

f.     any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g.     any passwords, password files, seed words, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

3.     For any digital device or other electronic storage media upon which electronically stored information that is called for by this warrant may be contained, or that may contain things otherwise called for by this warrant:

   a.     evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b.     evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c.     evidence of the lack of such malicious software;

   d.     evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

   e.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

   f.     evidence of the times the digital device or other electronic storage media was used;

   g.     passwords, encryption keys, seed words, and other access devices that may be necessary to access the digital device or other electronic storage media;

     h.     documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the digital device or other electronic storage media;

     i.     contextual information necessary to understand the evidence described in this attachment.

4.     Records and things evidencing the use of an Internet Protocol (IP) address to communicate with the internet, including:

     a.     routers, modems, and network equipment used to connect computers to the internet;

     b.     records of Internet Protocol addresses used;

     c.     records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses.

5.     Any and all hidden services accounts or encrypted chat applications used in furtherance of the offenses described above, including, but not limited to, darknet market accounts, associated darknet forum accounts, Tor-based email accounts, and Wickr handles and logins.

6.     Any and all peer to peer (P2P) virtual currency trading platform accounts, with no legitimate or identified service provider to which legal process may be served, used in furtherance of the offenses described above, including, but not limited to, localbitcoins.com accounts or bitcoin-otc internet relay chat channel accounts.

7.     Virtual currency in any format, including but not limited to, wallets (digital and paper), seed words, usernames and passwords, public keys (addresses) and private keys.

8.    Fiat currency (U.S. dollars or other government issued currency).

9.    Keys to storage units, suites, lockers and safe deposit boxes.

10.   Firearms or other prohibited weapons that are not registered to XAVIER ALEXANDER
SPEROPOULOS or CROWE or their cohabitants.

11.   Controlled substances and associated paraphernalia.

THE SEIZURE OF DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA
AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS SPECIFICALLY
AUTHORIZED BY THIS SEARCH WARRANT, NOT ONLY TO THE EXTENT THAT
SUCH DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA CONSTITUTE
INSTRUMENTALITIES OF THE CRIMINAL ACTIVITY DESCRIBED ABOVE, BUT ALSO
FOR THE PURPOSE OF CONDUCTING OFF-SITE EXAMINATIONS OF THEIR
CONTENTS FOR EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE
AFOREMENTIONED CRIME.